## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **PETCO ANIMAL SUPPLIES STORES, INC.,** | **8:14CV280** |
| **Plaintiff,** | |
| **vs.** | **MEMORANDUM AND ORDER** |
| **THE FIVE FIFTY TWO CORPORATION, a Nebraska corporation;** | |
| **Defendant.** | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 83) filed by Plaintiff Petco Animal Supplies Stores, Inc. ("Petco"). Also before the Court is the Motion in Limine (Filing No. 76), Motion for Summary Judgment (Filing No. 84), Motion to Strike (Filing No. 98), and Motion in Limine (Filing No. 120) filed by Defendant The Five Fifty Two Corporation ("The 552").

## FACTUAL BACKGROUND

The following facts are those stated in the parties' briefs and supported by pinpoint citations to evidence in the record, and admitted or not properly resisted by the opposing party as required by NECivR 56.1[1] and Federal Rule of Civil Procedure 56.

---

[1] *See* NECivR 56.1(b)(1) (effective December 1, 2014):

The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

The parties have filed competing Motions for Summary Judgment and have substantially complied with NECivR 56.1(b) with respect to the presentation of their own facts and evidence.

The 552 is the owner of a commercial building, real property, and improvements commonly known as 7110 Dodge Street, Omaha, Nebraska (the "Leased Premises"). On or about August 21, 1997, Petco and The 552 entered into a commercial lease (the "Lease"), with The 552 as landlord and Petco as tenant of the Leased Premises. Under the terms of the Lease, Petco was granted three separate five-year renewal options, the first of which Petco exercised on or about September 25, 2012; thus, extending the term of the Lease to January 31, 2018. The 552 alleges that Petco defaulted under the terms of the Lease by failing to comply with maintenance and repair obligations, and failing to timely cure those defaults after receiving notice.

Petco seeks a declaratory judgment that it is not in default of the Lease. (Filing No. 1 ("Complaint").) The 552 filed a counterclaim seeking a declaratory judgment confirming Petco's default and upholding The 552's termination of the Lease. (Filing No. 11 ("Answer and Counterclaim").) On November 17, 2014, the Court preliminarily enjoined The 552 from instituting eviction proceedings against Petco and from otherwise attempting to regain possession of the Leased Premises during the pendency of this case. (Filing No. 32.) Pursuant to the Order, Petco was required to post a $250,000 bond with the Court. (Filing No. 32.)

I.    **Maintenance Obligations and Alleged Default**

The Lease required Petco to "maintain and replace, as necessary" the Leased Premises and its systems, in "good condition and repair." (Filing No. 27-4 at ECF 10, ¶ 13(a).) Paragraph 24 of the Lease provided the conditions under which a "Tenant Event of Default" ("TED") justifying termination of the Lease could occur, stating that a TED could occur when Petco defaulted in the performance of any covenant under the Lease

(other than the payment of rent), and failed to cure or commence curing its default within 30 days of notice of the default. (Filing No. 27-4 at ECF 18, ¶ 24(b).) Petco took possession of the Leased Premises in 1997 in an "as is" condition. Petco presently remains in possession of the Leased Premises. (Filing No. 27-4 at ECF 8, ¶ 6; Filing No. 32.)

Prior to January 2014, The 552 notified Petco of an alleged failure to comply with maintenance obligations under the Lease. On June 9, 2011, counsel for The 552 sent a notice to Petco (the "2011 Notice") citing several examples of deferred maintenance at the Leased Premises, including ceiling and roof repairs, and said the examples were not all-inclusive. (Filing No. 28-2.) The 2011 Notice informed Petco that it would be in default of the Lease if the defects were not cured "within 30 days of the date of this Notice or as otherwise provided in the Lease." (Filing No. 28-2.) On July 16, 2012, counsel for The 552 sent another notice to Petco (the "2012 Notice") citing more examples of deferred maintenance at the Leased Premises, and telling Petco the examples were not all-inclusive. (Filing No. 28-6.) Both the 2011 and 2012 Notices said Petco had a legal obligation to "continue to maintain the [Leased] Premises as and when necessary," and to "immediately inspect the [Leased] Premises for any additional maintenance or repairs that need to be completed." (Filing Nos. 28-2 and 28-6.) The 2011 and 2012 Notices also informed Petco that its "obligation to maintain and repair the [Leased] Premises is a continuing one" and explained that "if [The 552] observes any continued or future signs of deferred maintenance or repair, such signs will be evidence that [Petco] has failed to cure its breach of the obligation to maintain the [Leased] Premises within 30 days of this Notice," and that Petco could be considered in

default without further notice.  (Filing Nos. 28-2 and 28-6.)  On April 11, 2013, counsel for The 552 sent a notice of default to Petco (the "2013 Notice") concerning Petco's failure to pay real estate taxes due for the Leased Premises and restated to Petco that it had a contractual obligation to cure the default within 10 days. (Filing No. 28-7.)

In the fall of 2013, CNA Financial Corporation ("CNA") issued real property casualty and general liability insurance coverage for the Leased Premises to be effective on January 1, 2014.  As part of its underwriting process, CNA engaged a third-party inspection service, Alexander & Schmidt, which in turn hired William Zersen ("Zersen"), to inspect and evaluate the condition of the Leased Premises.   As part of his inspection, Zersen completed a report describing the general condition and specific problem areas of the Leased Premises (the "Zersen Report") noting that the "overall maintenance and building condition was fair to poor." (Filing No. 90-8 at ECF 33.)  He found that "[t]here is a substantial crack in the exterior load bearing wall," and "[c]eiling stains on drop tile ceilings in various locations [which] may be due to roof leaks though no active leaks were seen at the time of the survey." (Filing No. 90-8 at ECF 33.) "Poor" is the lowest rating that Zersen gave to any building, with the other possible ratings being fair, above average, and good, in order of increasing quality. (Zersen Deposition, Filing No. 90-8, 78:25–79:21.) Zersen also checked the box indicating "poor building condition," primarily on the basis of "a crack of [a] magnitude" not often seen "in the exterior wall of a building" and the possible roof leaks. (Zersen Deposition 34:22–35:9; 78:8–19; Filing No. 90-8 at ECF 33.)  Zersen also noted that maintenance of the Leased Premises was not being performed on a preventive basis and recommended that such a program be put in place. (Filing No. 90-8 at ECF 48.)

Based on the maintenance issues in the Zersen Report, counsel for The 552 sent a letter to Petco dated January 29, 2014, informing Petco that it continued to be in default of its maintenance obligations under the Lease (the "January 2014 Notice"). (Filing No. 28-9.) The January 2014 Notice identified Petco's maintenance defaults specifically, stating that Petco failed to repair a crack in the outside wall, the water-damaged ceiling tiles, the damaged floor tiles, and the possible roof leaks. (Filing No. 28-9 at ECF 1.) The 552 requested that repairs be made immediately, and that Petco have the roof inspected and repaired, if needed. (Filing No. 28-9 at ECF 1–2.) The January 2014 Notice stated that Petco would be in default of the Lease if it failed to cure the defects identified. (Filing No. 28-9 at ECF 2.) It also stated that the "list is not intended to be all-inclusive and [Petco] should immediately inspect the [Leased] Premises for any additional maintenance or repairs that need to be completed and report them to [The 552]." (Filing No. 28-9 at ECF 2.) It also directed Petco to inspect the electrical system. (Filing No. 28-9 at ECF 2.) The Notice stated that "if [The 552] observes any continued or future signs of deferred maintenance or repair, such signs will be evidence that [Petco] has failed to cure its breach of the obligation to maintain the [Leased] Premises within 30 days of this Notice, and [Petco] will be in default of the Lease without any further notice from [The 552]." (Filing No. 28-9 at ECF 2.)

On April 30, 2014, because The 552 had received no response from Petco, The 552 sent a letter to Petco entitled Notice of Default and Termination of Lease (the "Termination Notice"). The Termination Notice stated that Petco defaulted on its maintenance obligations, and The 552 elected to terminate the Lease. (Filing No. 27-1.) The Termination Notice provided Petco until June 15, 2014, to vacate the Leased

Premises. (Filing No. 27-1.)  The Termination Notice also stated that Petco knew of the issues specifically listed in the Notice of Default, and provided examples of previous maintenance issues.  The Termination Notice stated that the default and termination of the Lease were based on the failure to cure after the January 2014 Notice, as well as previous maintenance issues.

## II.  Response to 2014 Notices

Mark Warren ("Warren") was employed as Petco's Director of Maintenance, Waste, and Recycling for seven years and oversaw repair and maintenance functions for 1,400 Petco stores. Warren's office was located in Texas, and he did not personally go the Leased Premises until July of 2014.  Elizabeth Lindahl ("Lindahl") was a District Manager for Petco.  Lindahl managed eighteen Petco stores in Nebraska, Iowa, South Dakota, and Illinois, including the store at issue in this case.  Lindahl stated that she did not have any responsibility with respect to the negotiation of or compliance with commercial leases or any day-to-day maintenance obligations at the Petco locations under her supervision.  Tammy Fitzgerald ("Fitzgerald") was the General Manager of the Petco store located on the Leased Premises during the relevant time and reported directly to Lindahl.  Fitzgerald was responsible for the daily operations of the store.

After receiving a legal notice from a local store manager, Petco's property management division was responsible for lease interpretation and compliance.  Petco's maintenance department was tasked with execution of maintenance or repair work in response to such notices when it was directed to do so by Petco's property management division. Fitzgerald and any other manager could report maintenance concerns by phone or computer.  Generally, maintenance requests and concerns were

submitted through a computer system called Service Channel and Petco's maintenance department would respond to the request. Fitzgerald stated that she was not aware of the crack in the north wall, but that she looked at it after receiving the January 2014 Notice. She did not look for other cracks or notice any other cracks. Fitzgerald faxed the January 2014 Notice to Lindahl and assumed Lindahl would take care of everything. On January 31, 2014, Fitzgerald made a computer entry through Service Channel regarding some of the issues identified in the January 2014 Notice, and stated that the repairs needed to be completed "asap". (Filing No. 21-2 at ECF 7; *see also* Filing No. 90-1, Fitzgerald Dep. 88:1–89:1, 108:19–109:9, 112:17–113:10; Filing No. 90-1 at ECF 101.) This entry became Work Order 44540881.

Work Order 44540881 was received by Petco contractor PVC Facility Management, Inc. ("PVC") on or about January 31, 2014; PVC contacted Fitzgerald the same day to discuss the requested work and to schedule an on-site visit to commence work. On or about February 4, 2014, PVC assessed the work necessary to respond to Work Order 44540881 at the Leased Premises. On that same day, ceiling tiles were replaced and plans were made for PVC to return. PVC returned to the Leased Premises on February 12, 2014, as part of its response to Work Order 44540881 to investigate additional necessary work. At that time, PVC observed a crack in the wall and confirmed there were no floor tile issues.[2] (Matt Aff., Filing No. 87-5 ¶ 11.) Based on this visit PVC requested repair bids from three different masons to identify a solution for the crack. On or about February 25, 2014, PVC submitted a proposal to Petco to repair

---

[2] Petco had commissioned a remodel of the aquatics area of the Leased Premises in December 2013, to include the installation of VCT (vinyl composition tile). This remodel had been completed on January 21, 2014. (Filing No. 21-2, QSI Invoice, at ECF 11.)

the crack, which proposal was approved by Petco on February 27, 2014. The solution PVC identified for the crack was to seal it using a product call Sonolastic NP 2. Due to the chemical properties of the product PVC believed it was necessary to wait until March 17, 2014, to ensure the masonry was in a suitable condition for a proper seal.

On April 10, 2014, a Petco assistant manager resubmitted to PVC the same computer entry previously submitted by Fitzgerald on January 31, 2014. Petco's first contact with The 552 regarding the maintenance issues identified in the January 2014 Notice was an email sent on April 11, 2014, in which Petco stated it had fixed several of the maintenance issues. PVC responded to the re-sent computer entry and requested contact information for The 552 to discuss the damaged foundation; but, on April 17, 2014, Petco ordered all work to be stopped, noting that Petco had hired another contractor.

Fitzgerald also entered Work Order No. 46571150 on April 10, 2014, indicating that the roof needed to be checked for a possible leak. Petco's roofing contractor, Simon Roofing and Sheet Metal ("Simon"), received Work Order No. 46571150 on or about April 11, 2014, via Service Channel. Simon responded to Work Order No. 46571150 at the Leased Premises on April 18, 2014. At that time temporary repairs were made to a disconnected pipe and open curb flashing. On or about May 8, 2014, Simon quoted Petco a price for permanent repairs needed to address the issues identified on April 18, 2014. Petco approved the proposed permanent repairs by issuing a purchase order on or about May 13, 2014. Simon came to the Leased Premises to complete the quoted permanent repairs on May 21, 2014.

Following discussions between the parties after Petco's receipt of the Notice of Termination, Petco learned that The 552 was not satisfied with Petco's cure of the crack in the exterior wall, although The 552 did not serve Petco with an additional notice to cure. (Badley Dep., Filing No. 87-1 at ECF 77:2-78:5.) Petco contacted a general contractor—W.D.S. Construction ("W.D.S.")—on May 23, 2014. Through W.D.S., Petco engaged Excel Engineering, Inc. ("Excel") to complete a full site assessment of the Leased Premises on May 30, 2014. Excel's qualified structural engineers issued a detailed report on June 2, 2014 (the "Excel Report"). The Excel Report referenced floor tile distress, identified four cracks including "Crack A" which extended from the exterior to the interior of a wall, and noted the presence of other cracks in the foundation wall in the basement. Petco prepared and submitted to The 552 a "scope of work" on July 24, 2014, to address structural issues, and advised of its intention to proceed with repairs. (Filing No. 87-2 at ECF 3.) On July 25, 2014, The 552 asked Petco to refrain from beginning work until The 552 could complete its review of Excel's engineering reports and consult its own engineers. (Filling No. 87-2 at ECF 4-5.) Petco did not receive permission to complete any structural repairs. The 552 argues that it did not give permission because Petco should have moved forward on the work regardless; The 552 had not received architectural plans; and the Notice of Termination already had been given.

Warren visited the Leased Premises in July 2014 and noted that "[t]here was a number of things that needed to be addressed" and that the building "was not up to our brand standard." In light of his observation, Warren drafted a list of remodeling and cosmetic items he thought should be addressed. Petco sent Warren's list to W.D.S.

Construction, Inc. ("W.D.S.") on July 18, 2014. The appearance and condition of the Leased Premises were the same when W.D.S. and Excel visited in late July 2014 as when Excel conducted its full site assessment and took pictures of the Leased Premises on May 30, 2014. The focus of the July 2014 visit to the Leased Premises, and the work eventually performed based on the visit, was cosmetic, such as infilling of a truck dock and construction of a new trash enclosure.

## STANDARD OF REVIEW

"Summary judgment is appropriate when, construing the evidence most favorably to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crozier v. Wint,* 736 F.3d 1134, 1136 (8th Cir. 2013) (citing Fed. R. Civ. P. 56(c)). "Summary Judgment is not disfavored and is designed for every action." *Briscoe v. Cnty. of St. Louis*, 690 F.3d 1004, 1011 n.2 (8th Cir. 2012) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) *cert. denied*, 132 S. Ct. 513 (2011)) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court will view "all facts and mak[e] all reasonable inferences favorable to the nonmovant." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd.,* 703 F.3d 1104, 1107 (8th Cir. 2013). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325.

Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Briscoe,* 690 F.3d at 1011 (quoting *Torgerson*, 643 F.3d at 1042) (internal quotation marks omitted). "'[T]he mere existence of some alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 972 (8th Cir. 2012) (quoting *Torgerson*, 643 F.3d at 1042) (internal quotation marks omitted). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no "genuine issue for trial" and summary judgment is appropriate. *Torgerson*, 643 F.3d at 1042 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)) (internal quotation marks omitted).

**DISCUSSION**

Although both parties seek to have their rights under the Lease declared, the essential question before the Court is whether The 552 was entitled to terminate the Lease. This question depends on whether Petco has breached the terms of the Lease in such a way to trigger the Lease's termination clause. In Nebraska,[3] a lease is to be construed as any other contract. *Newman v. Hinky Dinky Omaha-Lincoln, Inc.*, 427 N.W.2d 50, 53 (Neb. 1988) (citing *Chadd v. Midwest Franchise Corp.*, 412 N.W.2d 453, 457 (Neb. 1987)). As such, the meaning of a lease and whether it is ambiguous are questions of law. *Timberlake v. Douglas County*, 291 Neb. 387, 392, --- N.W.2d --- (2015). "When the terms of a contract are clear, a court may not resort to rules of construction, and the terms are to be accorded their plain and ordinary meaning as an ordinary or reasonable person would understand them." *Kercher v. Board of Regents of University of Nebraska*, 436, 860 N.W.2d 398, 405 (Neb. 2015). The parties agree that the terms of the Lease are unambiguous and the Court may afford the terms their plain and ordinary meaning. Relevant to this case, in order to terminate the Lease, The 552 must demonstrate that Petco defaulted on its obligations and failed to cure its default after notice. For the reasons stated, the evidence does not establish that Petco's breach, if any, was sufficient to terminate the Lease. Further, even if any breach by Petco *was* sufficient to trigger the Lease's termination clause, Petco cured the default or commenced and diligently pursued to cure the default after receiving notice.

---

[3] The parties agree that Nebraska substantive law applies in this case.

## I.    Forfeiture Under the Lease

The 552 asserts that Petco repeatedly defaulted on its obligations and The 552 is entitled to terminate the Lease. The Court recognizes that in Nebraska, "[f]orfeitures of estates under leases are not favored in law and the right to forfeit must be clearly stipulated." *Olson v. Pedersen*, 231 N.W.2d 310, 314 (Neb. 1975); *see also* 52 C.J.S. *Landlord & Tenant* § 175 (2015) ("Generally, forfeiture of a leasehold for the breaking of a condition is looked upon with disfavor, and leases are strictly construed against party claiming forfeiture."). Thus, "[i]n the absence of a statute or an express and distinct contract provision requiring otherwise, a forfeiture of a lease may be declared only where a breach is so material and substantial as to defeat the objects of the parties in making the contract." *Caeli Associates, Inc. v. Firestone Tire & Rubber Co.*, 415 N.W.2d 116, 121 (Neb. 1987) (citing *Olson*, 231 N.W.2d at 314). "If a forfeiture has not been stipulated for, a covenant or condition which is merely implied, or an express [covenant not] clearly within the forfeiture clause, will not sustain a claim of forfeiture for breach." *Olson*, 231 N.W.2d at 314; *see also* 52 C.J.S. *Landlord & Tenant* § 188 (2015) ("Where grounds of forfeiture are expressly designated in the lease, a forfeiture will not be permitted on other grounds. Covenants will not be extended by implication to sustain a claim of forfeiture.")

Paragraph 25 of the Lease states that "[u]pon the occurrence of any Tenant Event of Default Landlord . . . may . . . [e]lect to terminate this Lease." (Filing No. 27-4 at ECF 19, ¶ 25(a).) Paragraph 24(b) of the Lease defines a TED with respect to the breach of non-monetary covenants:

There shall not be held to be a Tenant "Event of Default" unless there is:

. . . .

> (b) default by Tenant in the performance or observance of any covenant or agreement of this Lease (other than a default involving the payment of money), which default is not cured within thirty (30) days after the giving of Notice thereof by Landlord, provided, however, that Tenant shall not be deemed to be in default if Tenant has commenced curing the default within the thirty (30) day period and thereafter diligently pursues the completion of such cure[.]

(Filing No. 27-4 at ECF 18, ¶ 24(b).)

The 552 claims that Petco was in violation of Paragraph 13(a), which requires Petco to "maintain and replace, as necessary" the Leased Premises and keep its systems in "good condition and repair." (Filing No. 27-4 at ECF 10, ¶ 13(a).) As a result, The 552 argues, Petco's violation of Paragraph 13(a) and subsequent failure to cure resulted in a TED, entitling The 552 to terminate the Lease under the Lease's forfeiture clause. The Court must first consider whether Petco violated its obligation under Paragraph 13(a). If so, the Court must determine whether Petco failed to cure, or commence and diligently pursue a cure, within 30 days of notice.

## II.  Burden of Proof

As a threshold matter, the Court addresses who bears the burden of proof. The parties have not identified any Nebraska case directly addressing which party has the burden of proof in an action to terminate a lease.[4] However, courts in other jurisdictions

---

[4] The 552 argues that because Petco is the plaintiff in this declaratory judgment action, Petco bears the burden of demonstrating that it is entitled to judgment as a matter of law. The 552 cites *Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 330 (8th Cir. 1996), for the proposition that the plaintiff in a declaratory judgment action seeking affirmative relief has the burden of proof. The Court first notes that The 552 has brought a counterclaim seeking a declaration of its rights under the Lease (Filing No. 11 at 12) and is likewise a plaintiff seeking summary judgment in this case. Further, the holding in *Am. Eagle Ins.* does not generally place the burden of proof on a party seeking declaratory rights. The court in *Am. Eagle Ins. Co.* held that the burden of proof in a diversity action is typically a matter of state law. *Id.* Under the facts of that case, the Eighth Circuit noted that "[u]nder Arkansas law, a party who files suit

14

consistently have held that the party seeking to terminate a lease bears the burden of proof.[5]   Further, in forcible detainer cases in Nebraska, when a tenant denies that it breached a lease, the burden of proof is on the landlord, and requires the landlord "to establish every material fact on which his right to recover depends."   *Boehler v. Kraay*, 264 N.W. 745, 746 (Neb. 1936); *see also* 49 Am. Jur. 2d *Landlord and Tenant* § 651 (stating that where a tenant denies allegations of default, "the landlord has the burden of establishing every element of his or her cause of action.").   The 552 argues that the burden of proof in forcible detainer cases is inapplicable because Petco chose this forum to determine its rights rather than await a forcible detainer action from The 552. However, The 552 has not identified any authority that places the burden on Petco to disprove that The 552 is entitled to terminate the Lease. The Court concludes that under Nebraska law, The 552 bears the burden of proving that it is entitled to forfeiture due to Petco's default.

## III.    Violation of Paragraph 13(a)

To meet its burden, The 552 first must demonstrate that Petco violated its obligation to keep and maintain the Leased Premises in good repair.   Petco contends

---

seeking to benefit from insurance coverage generally bears the burden of proving coverage."   *Am. Eagle Ins. Co. v. Thompson*, 85 F.3d 327, 330 (8th Cir. 1996).   Thus, the Court looks to Nebraska law to determine who carries the burden of proof.

[5] *See e.g. Serna v. Gutierrez*, 2013-NMCA-026, 297 P.3d 1238, 1242 (N.M. 2013) ("The burden was on Landlord to present evidence to establish his basis to terminate the Lease."); *Heasley v. KSM Energy, Inc.*, 52 A.3d 341, 344 (Penn. 2012) ("The party seeking to terminate the lease bears the burden of proof."); *1500 Mineral Spring Associates, LP v. Gencarelli*, 353 B.R. 771, 786 (D.R.I. 2006) ("[T]he party asserting surrender has the burden of proving it."); *Sorum v. Schwartz*, 411 N.W.2d 652, 654 (N.D. 1987) ("Forfeitures are not favored, and the burden of proof is on the party claiming forfeiture of the lease.") (internal citations omitted); *202 Marketplace v. Evans Products Co.*, 824 F.2d 1363, 1366 (3d Cir. 1987) (stating that landlord bears burden of proving forfeiture); *In re Fifth Ave. Originals*, 32 B.R. 648, 655 (Bankr. S.D.N.Y. 1983) ("The burden of proof is on the landlord to prove a forfeiture by a preponderance of the evidence."); 52 C.J.S. Landlord & Tenant § 188 (2015) ("[T]he burden of proof is on the party claiming forfeiture of the lease.").

The 552 cannot prove a TED because The 552 has not shown that the condition of the Leased Premises in January of 2014 was any different than at the beginning of the Lease. Petco cites to Paragraph 13(b) of the Lease which states:

> (b) Upon termination of the Lease, Tenant agrees to leave the Premises in no worse condition than the Premises were received by Tenant, allowance being made for ordinary wear and tear. Tenant agrees that at the end of the Term of this Lease, any improvements made by Tenant and not removed by Tenant within ten (10) days of the date this Lease terminates, shall become the property of Landlord and remain upon the Premises, subject to the terms of Exhibit "D" attached hereto.

(Filing No. 27-4 at ECF 10, ¶ 13(b).) Petco argues that the phrase "no worse condition than the Premises were received" Paragraph 13(b) implies that Petco's maintenance obligation under Paragraph 13(a) is limited to maintaining the Leased Premises in the condition in which they were received. The 552 argues that the obligations set forth in Paragraphs 13(a) and 13(b) are separate covenants. Specifically, The 552 contends that the covenant contained in Paragraph 13(a) creates a continuing duty that may be enforced at any time during the term of Lease, while the duty created by Paragraph 13(b) does not arise until the Lease terminates and Petco vacates the Leased Premises. The 552 cites *Ed Miller & Sons, Inc. v. Earl*, 502 N.W.2d 444, 450 (1993), in which the Nebraska Supreme Court held that a lessor is entitled to maintain an action for breach of a covenant to repair as soon as the lessee fails to repair the premises and need not wait until the term of the lease expires.

The Court recognizes, and Petco does not dispute, that The 552 can enforce the covenant to repair prior to the end of the lease. However, this question is not before the Court. The 552 is not seeking damages for Petco's breach, but termination of the Lease. The Lease does not provide express guidance as to the standard of repair and

good condition to which Petco is held during the term of the Lease. In *Quist v. Duda*, 67 N.W.2d 481, 485 (Neb. 1954), a lease required the landlord to keep certain equipment in good repair, though, as in this case, the lease did not expressly define what was required to fulfill this covenant. *Id.* The court therefore asked "[w]hat then, is included in defendants' covenant to 'keep in repair'?" To answer this question the court first noted the difference between the terms "repair" and "improvement," noting that a covenant in a lease to keep premises in good repair does not impose a requirement to make improvements or betterments. *Id.* at 486. The court also noted that courts in other jurisdictions had held that covenants to keep in repair impose "an obligation merely to keep the premises in as good repair as they were when the agreement was made." *Id.* (citing *Taylor v. Gunn*, 227 S.W.2d 52, 56 (Tenn. 1950); *St. Joseph & St. L.R. Co. v. St. Louis, I.M. & S. Ry. Co.*, 36 S.W. 602, 608 (Mo. 1896)).[6] Based on this reasoning, the Nebraska Supreme Court concluded: "Covenants to keep premises in repair and to keep in as good repair as they now are amount to the same thing in law." *Id.*

Following the Nebraska Supreme Court's reasoning in *Quist*, the covenant in Paragraph 13(a) requires only that Petco keep the Leased Premises in as good condition and repair as they were at the outset of the Lease. This conclusion is supported by, but not dependent on, the requirement in Paragraph 13(b) that Petco

---

[6] *See also Razorbacks v. Graphic Packaging Int'l, Inc.*, No. 4:12-CV-00158-KGB, 2014 WL 911944, at *3 (E.D. Ark. Mar. 7, 2014) (noting that "where the lease contract specifically requires the tenant to keep the premises in good repair the only obligation is to return the property in substantially the same condition as it was at the beginning of the tenancy."); *Holt v. State,* 290 S.W.3d 21, 27 (Ark. Ct. App. 2008) (quoting Webster's II Dictionary to define "keep" as "to remain in a given state: stay" and "maintain" as "to keep an existing state"), *rev'd in part on other grounds,* 348 S.W.3d 562 (Ark. 2009).

"leave the Premises in no worse condition than the Premises were received by Tenant[.]" The Lease does not require Petco to make improvements or betterments.

The Court cannot determine whether Petco breached Paragraph 13(a) because there is insufficient evidence of the condition of the Leased Premises when Petco received them. The Court has thoroughly reviewed the extensive evidence submitted, and there are no specific references to the condition of the Leased Premises at the inception of the Lease. The 552 cites to portions of the Deposition of Ron Badley to demonstrate that the Leased Premises were generally in good condition at the commencement of the Lease. However, the cited portions of the Deposition do not provide any specific information about the condition of the Leased Premises, much less the defects now at issue.[7] The parties agree that Petco took possession of the Leased Premises "as-is" at the commencement of the Lease. Even The 552's expert, Brett Cook, was unable to testify whether the Leased Premises in January 2014 were in the same condition, better condition, or worse condition than when the Lease commenced. (Cook Dep., Filing No. 87-1 at 32:21-33:10.)

The 552 suggests that Paragraph 13(a)'s requirement to "keep, maintain and replace, as necessary" the Leased Premises and its systems "in good condition and repair" exists without reference to the condition of the Leased premises at the time Petco took possession. However, this leaves the Court with no objective standard by

---

[7] *See* Badley Deposition, Filing No. 107-2 at 28:10-29:3 (describing the tenants prior to Petco as "good tenants" and paid their rent on time); 33:4-16 (stating that Badley had no photographs or documentation as to the condition of the building at the time Petco took possession of the Leased premises); 35:23-36:9 (noting that Badley was not aware of any structural changes required before Petco took possession of the Leased Premises); 84:7-9 (stating that Badley was not aware of concerns or issues relating to settlement of the foundation).

which to measure Petco's alleged breach. Other jurisdictions have noted that "when a tenant covenants to keep the premises in 'good order' or 'good repair', and the covenant does not specifically indicate the quality and nature of the repairs to be made, then the extent of the obligation is limited by the age and class of the premises involved." *In re Royal Yarn Dyeing Corp.*, 114 B.R. 852, 857 (Bankr. E.D.N.Y. 1990). The building on the Leased Premises was built in the 1950s and had many years of use before the term of the Lease began. Given Nebraska law's aversion to forfeiture and The 552's burden to prove each and every fact establishing forfeiture, combined with the undisputed age and use of the building on the Leased Premises, the Court is not willing to infer a default under the Lease sufficient to justify forfeiture based on Petco's alleged failure to repair, without objective evidence of the condition of the Leased Premises at the time the Lease commenced.

## IV. Tenant Event of Default

Even if The 552 had demonstrated a default based on Petco's failure to make certain repairs, The 552 has not demonstrated a TED occurrence justifying termination of the Lease because Petco attempted to cure the alleged defects after receiving notice. As noted above, The 552 cannot demonstrate a TED occurrence if (1) Petco cured a default within 30 days after The 552 gave notice of default, or (2) Petco commenced curing the default within 30 days of a notice of default and thereafter diligently pursued the completion of a cure. (Filing No. 27-4 at ECF 18, ¶ 24(b).)

The Court first notes that the parties disagree about when Petco received notice of default. The 552 argues that the January 2014 Notice (Filing No. 28-9.) was notice of default under the Lease. Petco argues that the letter of January 29, 2014, was merely a

notice to cure. Petco notes that the letter stated "[y]ou are advised that you *will be in default* of the Lease if you do not cure the aforementioned defects within 30 days of the date of this Notice, and continue to maintain the Premises as and when necessary." (Filing No. 28-9 at ECF 2 (emphasis added).) According to Petco, it was not notified of its default until April 30, 2014, when The 552 notified Petco that it had defaulted on its maintenance obligations and The 552 was electing to terminate the Lease. (Filing No. 27-1.) For purposes of the pending Motions, even if the January 2014 Notice was sufficient to trigger Paragraph 24(b), The 552 has not proven that Petco's efforts to cure were so lacking as to permit forfeiture.

### A.     Scope of the Notice of Default

The January 2014 Notice informed Petco that it continued to default in the performance of its maintenance obligations under the Lease. (Filing No. 28-9.) It specifically identified four maintenance defaults, and stated that Petco was required to repair and/or maintain the following:

i. "crack in outside wall;"

ii. "water damaged ceiling tiles;"

iii. "damaged and/or missing floor tiles; and"

iv. "possible roof damage or leaks, as evidenced by the water damaged ceiling tiles."

The Landlord requests that the Tenant make the listed repairs immediately and have the roof inspected and repaired if damaged. Given that the Tenant was previously advised of its default in its maintenance responsibilities, and that the above noted items are a continued default of Tenant's maintenance responsibilities, Landlord is not obligated to give the Tenant an additional cure period. However, in this instance, Landlord will give the Tenant 30 days from the date of this Notice to cure the defects. You are advised that you will be in default of the Lease if you do not cure

the aforementioned defects within 30 days of the date of this Notice, and continue to maintain the Premises as and when necessary.

(Filing No. 28-9 at ECF 1–2.)

The Notice further stated that the "list is not intended to be all-inclusive and [Petco] should immediately inspect the [Leased] Premises for any additional maintenance or repairs that need to be completed and report them to [The 552]." (Filing No. 28-9 at ECF ECF 2.) The Notice also directed Petco to inspect the electrical system. (Filing No. 28-9 at ECF 2.)

The parties disagree about the scope of the January 2014 Notice. The 552 asserts that the Notice was broad based on its catch-all statement that the four enumerated items were "not intended to be all-inclusive." However, "the purpose of a notice to cure is to specifically apprise the tenant of claimed defaults in its obligations under the lease and of the forfeiture and termination of the lease if the claimed default is not cured within a set period of time." *NL Indus., Inc. v. PaineWebber Inc.*, 720 F. Supp. 293, 300 (S.D.N.Y. 1989) (citations omitted). While The 552 was free to remind Petco of its maintenance obligation under the Lease, The 552's broad assertion that *any* failure to uphold Petco's maintenance obligation would constitute default did not give sufficient notice to permit Petco to cure such a default. Under the terms of the Lease, The 552 must, at least, apprised Petco of the nature of its breach and provide some direction as to how to cure the default. *Cf. Gilroy v. Ryberg*, 667 N.W.2d 544, 556 (Neb. 2003); *see also Hooton v. Nacarato GMC Truck, Inc.*, 772 S.W.2d 41, 45 (Tenn. Ct. App. 1989) ("Conditions not included in the notice of default cannot properly serve as a

basis for forfeiture."). Thus, the Notice's catch-all statements did not trigger the 30-day cure period with respect to all possible maintenance concerns.

Similarly, the Notice to Cure's references to a "continued default of Tenant's maintenance responsibilities" did not trigger the cure period with respect to all possible maintenance concerns. While there is evidence of several past maintenance issues, the Lease does not contain a "chronic default" or "continuing default" provision, nor is "chronic default" or "continuing default" included as one of the three definitions of a TED. With respect to any previous defaults, The 552's corporate representative stated "substantially all, if not all" were addressed prior to the January 29, 2014, letter. (Badley Dep., Filing No. 87-1, at ECF 86:24-89:10.)

Petco was not required, upon penalty of a TED, to perform requests contained in the January 2014 Notice that were not based on express covenants in the Lease. The Lease does not affirmatively require inspections of the roof or the electrical system. Although the January 2014 Notice requested that Petco inspect the electrical system, there was no corresponding problem to be cured. With respect to the roof, the Notice requested that an inspection take place and repairs be made if necessary. Because The 552's request for repairs was conditional, there was no indication that Petco was required to cure any default through a roof inspection. The Notice gave Petco the ability to first determine whether the stains on the ceiling tiles were a result of a roof leak before Petco commissioned any roof repairs. Finally, the Lease does not require that Petco report its cure efforts to The 552. The Lease instead provides The 552 with a right to inspect the premises upon notice to Petco. (Filing No. 27-4 at ECF 16 ¶ 20.) As noted above, the Court will not infer covenants when determining whether a party may

22

obtain forfeiture under a lease. Accordingly, The 552 was not entitled to terminate the Lease based upon requests in the January 2014 Notice that did not correspond with tenant duties mandated in the Lease.

The specifically listed maintenance issues were the only issues in the January 2014 Notice that apprised Petco of the nature of its alleged breach. With respect to those issues, the Notice stated that Petco would be in default if it "failed to cure the aforementioned defects within 30 days of the date of this Notice." (Filing No. 28-9 at ECF 2.) Accordingly, to avoid default, Petco needed to cure, or commence and diligently pursue a cure, of the four enumerated items within 30 days of January 29, 2015.

## B.      Cure of the Alleged Defaults

Petco claims that it commenced curing the alleged defaults on January 31, 2014, when it entered Work Order 44540881. Work Order 44540881 stated:

> Sales Floor/ Wall Repair/ Wall Repair/ Misc. Repair/ I could not find this in any of the descriptions but we have several ceiling tiles that are water damaged and need to be replaced. The ceiling are to [sic] high for us to reach to do it ourselves. Also there is a crack in the exterior wall as well as some broken floor tiles that need repair. We were served a letter from our landlord that this repair needs to be completed asap.

(Filing No. 21-2 at ECF 7.) The Court notes that the Lease provided no guidance as to the methods for curing defaults and the Court cannot infer requirements for the purpose of determining whether The 552 is entitled to terminate the Lease. *See Olson*, 231 N.W.2d at 314 (stating that breach of an implied covenant will not sustain a claim of forfeiture for breach). For example, there was no requirement that Petco hire a third-party property manager or perform quarterly inspections with engineers or contractors.

(Cook Dep. 21:7-16; 51:8-20.) Nor was there any requirement that Petco only use specific contractors to perform repair or maintenance, or implement a specific schedule or maintenance calendar. (Cook Dep. 50:6-10.) The only requirement under the Lease was that Petco cure the defect or commence and diligently pursue a cure. (Filing No. 27-4 at ECF 18, ¶ 24(b).)

### 1. *"crack in outside wall"*

The evidence demonstrates that Petco commenced curing the crack[8] in the exterior wall and diligently pursued its cure. Work Order 44540881, entered three days after the Notice of Default was sent, specifically referenced a crack in the exterior wall. (Filing No. 21-2 at ECF 7.) On or about February 12, 2014, Petco's contractor, PVC, returned to the Leased Premises to inspect the crack. (Filing No. 87-5, Matt Aff. ¶ 11.) PVC then obtained bids from three different masons to identify a remedy for the crack. (*Id.* ¶ 12). On or about February 25, 2014, PVC submitted a proposal to Petco for repair of the crack, which Petco approved on February 27, 2014. (*Id.* ¶ 14.) PVC proposed sealing the crack using a product called Sonolastic NP 2. (*Id.* ¶ 15.) Due to the chemical properties of the product, PVC believed it was necessary to wait until March 17, 2014, to ensure the masonry was amenable to a such a seal. (*Id.* ¶ 15.) This evidence demonstrates that between receiving Work Order No. 44540881 on January 31, 2014, until the crack was sealed on March 17, 2014, PVC worked as diligently as circumstances allowed.

---

[8] The 552 noted that although the Notice referenced a "crack" in an exterior wall, there was no dispute that there were several cracks present. Thus, to the extent The 552 implies that Petco was required to cure each of the cracks instead of just "a crack" to avoid default, the Notice was insufficient.

Following discussions between the parties after Petco's receipt of the April 4, 2014, Notice of Default and Termination of Lease, Petco learned that The 552 was not satisfied with Petco's cure of the crack, although The 552 did not serve Petco with another notice to cure with respect to that issue. (Badley Dep., Filing No. 87-1 at ECF 77:2-78:5.) Petco responded to The 552's concerns, however, by retaining a construction general contractor—W.D.S.—on May 23, 2014, which in turn retained an engineering consultant—Excel—to assess the crack and identify a permanent improvement solution. (Warren Aff., Filing No. 87-3 ¶¶ 14-23.) Petco then prepared a "scope of work" that included extensive structural improvements to the premises in the area of the crack. (*Id.*) Petco submitted this scope of work to The 552 through counsel on July 24, 2014, and advised The 552 of Petco's intention to proceed. (Filing No. 87-2 at ECF 3.) On July 25, 2014, The 552 asked Petco to refrain from commencing work until The 552 could complete its review of Excel's engineering reports and consult with its own engineers. (Filling No. 87-2 at ECF 4-5.) Petco filed this action on September 17, 2014. (Filing No. 1.)

This evidence demonstrates that although Petco may not have cured the crack in the exterior wall, it commenced an attempt to cure within 30 days and diligently pursued the cure until it filed this action. Although The 552 did not approve Petco's initial course of action, Petco was not required to gain approval under the Lease.[9] Further, after

---

[9] The 552 asserts that Petco's efforts were wholly inadequate because the caulk was an insufficient solution and that Petco's repairs and instructions to its contractors were only temporary until September 2014. However, the Lease does not require a specific method for repair, nor does it require The 552's approval to avoid forfeiture. Thus, adopting The 552's arguments would require the Court to infer covenants not contained within the Lease's forfeiture provision. *See Olson*, 231 N.W.2d at 314. The 552 has failed to demonstrate that these efforts were unreasonable under the circumstances so as to justify forfeiture.

becoming aware of The 552's concerns, Petco attempted to pursue an alternative cure. It continued to pursue the alternative cure until The 552 instructed Petco to refrain from commencing work while The 552 reviewed the engineering reports. Under the terms of the Lease, Petco could not commence any structural alteration to the Leased Premises without The 552's consent. (Filing No. 27-4 at ECF 12, ¶ 16(a).) Under the circumstances and express terms of the Lease, and in light of the law disfavoring forfeiture, the Court concludes that Petco began to cure, and diligently pursued a cure, for the crack in the exterior wall within 30 days of the Notice of Default.

### 2. "water damaged ceiling tiles"

With respect to the ceiling tiles, the evidence demonstrates that Petco cured, or attempted to cure, the issue identified in the January 2014 Notice. PVC contacted the Petco manager at the Leased Premises the same day it received Work Order No. 44540881 to discuss the work order and to schedule an onsite visit for February 3, 2014. (Filing No. 87-5, Aff. of A. Matt, ¶ 9.) PVC personnel were on site by February 4, 2014, to assess the work necessary to respond to Work Order No. 44540881. At that time, PVC replaced stained ceiling tiles. (*Id.* ¶ 10.) Accordingly, there is evidence that the ceiling tile issue identified in the Notice to Cure was cured within 30 days of the Notice.

The 552 argues that this cure was insufficient because PVC did not inspect the Leased Premises and relied on the manager to point out which ceiling tiles to replace. The Notice did not specify the ceiling tiles to be replaced, however, and there is no evidence that PVC ignored some stained ceiling tiles while replacing others. Thus, based on the evidence, the ceiling tile issue was specifically addressed within days of

the Notice. The 552 further argues that there were stained ceiling tiles as late as August 2014. There is no evidence, however, that the stained ceiling tiles were the same ones contemplated by the Notice. Further, as discussed more fully below, there is evidence that Petco began to address the stained ceiling tiles through repairs to the roof. Accordingly, The 552 has not demonstrated that Petco's response to the stained ceiling tiles justifies forfeiture under the Lease.

### 3. "possible roof damage or leaks, as evidenced by the water damaged ceiling tiles"

With respect to the possible roof damage or leaks, Petco suspected the water staining might not be from a roof leak and could be the result of HVAC condensation. (Filing No. 87-1 at ECF 144.) Petco suspected this to be true, because the Leased Premises had no problems with leaking during rain or periods of melting snow. (*Id.*) When it became apparent there might be an issue beyond condensation from HVAC ductwork, on April 10, 2014, the Petco assistant manager, Amy Moffat, submitted Work Order. No. 46571150. (Filing No. 88-3 at ECF 12.) On April 11, 2014, PVC noted that Petco had reported "additional" damaged ceiling tiles. (Filing No. 88-3 at ECF 12.) Accordingly, Work Order. No. 46571150 was received by Simon Roofing and Sheet Metal Corp. ("Simon") on April 11, 2015. (Filing No. 87-6, Morris Aff., ¶ 8.) Simon responded to Work Order No. 46571150 on April 18, 2015, and determined the cause of the water staining above the aquatics area was a disconnected pipe and open curb flashing. (*Id.* ¶ 9.) At that time temporary repairs were made until Simon could submit a quote for permanent repairs, which it did on May 13, 2014. (*Id.* ¶ 10.) Petco approved the quote for permanent repairs and those were completed on May 21, 2014.

This evidence demonstrates that Petco commenced a cure within thirty days of the Notice and thereafter was diligent in pursuing a cure to completion. The January 2014 Notice did not identify damage to the roof, but advised Petco to repair the roof "if necessary." (Filing No. 28-9 at ECF 2.) Therefore, it was not unreasonable for Petco first to replace the ceiling tiles and then monitor the issue to determine whether the water stains were the result of roof damage or some other problem. The sales manager for Simon testified that it was not uncommon in Simon's practice to troubleshoot a suspected leak in a roof before locating a problem. (Filing No. 87-6, Morris Aff., ¶ 18.) Petco's actions were consistent with Simon's practice and the Notice. As stated in the Notice itself, the evidence of possible roof leaks was the water damage on ceiling tiles. Based on the lack of evidence of leakage during wet weather, Petco replaced ceiling tiles within 30 days of the Notice to determine whether the stains persisted. When additional stains were observed in April 2014, Petco immediately contacted a roofing contractor and arranged for an inspection and repair. Accordingly, the Court cannot conclude that Petco's actions with respect to the roof justified forfeiture under the Lease.

### 4. "damaged and/or missing floor tiles"

The floor tiles referenced in the Notice of Default were addressed by a remodel in the aquatics department completed between December 18, 2013, and January 21, 2014. (Filing No. 21-2, QSI Invoice, at ECF 11.) On or about February 12, 2014, PVC was on site and confirmed there were no floor tile issues. (Filing No. 87-5, Matt Aff., ¶ 11; Filing No. 91-6 at ECF 2.) Accordingly, the floor tile issue identified in the Notice of Default was cured within 30 days of the January 2014 Notice.

The 552 argues that Petco failed to address the floor tiles in a timely manner because it did not conduct an inspection of the floor until May 30, 2014, when Excel engineers noted several cracked floor tiles. (Filing No. 88-2 at ECF 217.) However, in addition to PVC and Petco's evidence that no floor tile issues existed in February 2014, The 552 has not shown that later floor tile defects were the same as those identified in the Notice. Accordingly, the Court cannot conclude based on the evidence that Petco failed to cure the floor tile issues identified in the Notice.

**CONCLUSION**

The 552 has not proved that it was entitled to terminate the Lease. It failed to demonstrate that the condition of the Leased Premises was any worse at the time of the Notice of Termination than when Petco took possession. Even if Petco was required to address the issues enumerated in the January 2014 Notice, Petco cured or commenced to cure those issues within 30 days of the Notice. Accordingly, under the terms of the Lease and in light of the law's disfavor of forfeiture unless clearly warranted, Petco's Motion for Summary Judgment will be granted, and The 552's Motion for Summary Judgment will be denied. The Court has not considered any evidence that was the subject of any pending motions in limine or motions to strike. Accordingly, those motions will be denied as moot.

IT IS ORDERED:

1. The Motion for Summary Judgment (Filing No. 83) filed by Plaintiff Petco Animal Supplies Stores, Inc., is granted;.

2. The Motion for Summary Judgment (Filing No. 84) filed by Defendant The Five Fifty Two Corporation, is denied;

3.     This case is dismissed with prejudice;

4.     All motions that remain pending in this case are denied as moot; and

5.     A separate judgment will be entered.

Dated this 6th day of January, 2016

                                        BY THE COURT:

                                        s/Laurie Smith Camp
                                        Chief United States District Judge